**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | **CASE NO. 8:07CR69** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **FINDINGS OF FACT** |
| **vs.** | ) | **AND** |
| | ) | **CONCLUSIONS OF LAW** |
| **RUFINO J. VILLARREAL,** | ) | |
| | ) | |
| **Defendant.** | ) | |

This matter is before the Court for findings of fact and conclusions of law pursuant to Federal Rule of Criminal Procedure 23(c), following a nonjury trial held on February 12-15, 2008.[1]  At trial, the United States was represented by Assistant United States Attorney Russell X. Mayer, and the Defendant, Rufino J. Villarreal, was represented by attorney Michael J. Tassett.

The trial revealed abundant evidence that Villarreal shamelessly manipulated the United States' immigration system, particularly the asylum application process, to the detriment of the United States and some of his clients.  The Court finds that the government did not demonstrate by evidence beyond a reasonable doubt, however, that Villareal intentionally defrauded his immigration clients as alleged in the Superseding Indictment.

---

[1]  The parties requested that a transcript be prepared prior to the submission of their post-trial briefs.  After the timely preparation of the transcript, a briefing schedule was set, certain extensions of time were granted, and briefs were finally submitted at the end of June, 2008.

## SUPERSEDING INDICTMENT

Villarreal, a now-disbarred lawyer,[2] was charged in a six-count Superseding Indictment (Filing No. 17) with mail fraud (Counts I-V) and money laundering (Count VI). Count I was dismissed on the government's motion. (Filing No. 62.)

The Superseding Indictment alleged that beginning on or about November 1, 2001, and continuing to on or about December 1, 2004, in Nebraska and elsewhere, Villarreal intentionally devised a scheme to defraud various immigration clients and to obtain money by means of materially false and fraudulent pretenses and promises. It alleged that Villarreal used the United States Postal service as well as private and commercial interstate carriers to submit asylum applications, knowing that pretenses, representations, and promises in the applications were false and fraudulent. Alternatively, the government charged that Villarreal aided and abetted the alleged scheme.

Count II concerned Jose Robles-Rangel ("Robles-Rangel"), and an alleged mailing date of June 24, 2002; Count III concerned Nora Soto ("Soto"), and an alleged mailing date of July 12, 2002; Count IV concerned Manuel Acosta ("Acosta"), and an alleged mailing date of April 18, 2002; Count V concerned Norma Elena Hernandez ("Hernandez"), and an

---

[2]Villareal was disbarred on January 30, 2004. See *State ex rel. Counsel for Discipline v. Rufino J. Villarreal*, 673 N.W.2d 889 (Neb. 2004). The Nebraska Supreme Court adopted a referee's findings, made upon clear and convincing evidence, that Villarreal engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation; engaged in conduct prejudicial to the administration of justice; handled legal matters without adequate preparation; neglected legal matters; failed to carry out a contract for employment; engaged in conduct prejudicial to clients; knowingly advanced unwarranted claims or defenses; knowingly made false statements; and violated his oath as an attorney.

2

alleged mailing date of August 1, 2002.  The government alleged violations of 18 U.S.C. §§ 1341 in Counts II through V.

In Count VI, the Superseding Indictment alleged that Villarreal engaged in a money-laundering scheme in violation of 18 U.S.C. §§ 1957.  The government charged that on or about August 15, 2002, in Nebraska, Villarreal engaged in and attempted to engage in a monetary transaction affecting interstate and foreign commerce, in criminally deriving property valued at approximately $42,654.67 from the alleged unlawful activity set out in Counts II through V.  As an alternative, the government charged that Villarreal aided and abetted the money-laundering scheme.

The government did not allege that Villarreal defrauded the United States or any agency or person associated with the government.  Instead, it alleged that Villarreal defrauded his own clients by inducing them to submit applications for asylum when they were not eligible for asylum, and that he accepted payments from them, knowing that their applications were without merit and that they could suffer serious adverse consequences as a result of the submission of the frivolous applications.

## FINDINGS OF FACT

The Court makes the following findings of fact.  Any finding of fact that is more properly considered a conclusion of law should be deemed as such.  Unless otherwise indicated, all findings of fact relate to the time relevant to the facts alleged in the indictment.

### *The Asylum Application Process*

1.   Jeffrey Stork was a criminal investigator with Immigration and Customs Enforcement ("ICE") from 2003 to the time of trial.  ICE is a division of the Department of Homeland Security ("DHS").  Between 1990 and 2003, Agent Stork was an

3

immigration inspector and immigration supervisor with the Immigration and Naturalization Service ("INS"), the predecessor agency of ICE, which oversaw the regulation of non-citizens entering into and departing from the United States. While with INS, Agent Stork conducted background checks regarding people applying for admission to the United States.

2. Kenneth Madsen was the Director of the DHS Chicago asylum office responsible for a sixteen-state area, from October 2005 to the time of trial. Madsen began his INS career in 1992 as an asylum officer in the Chicago office, responsible for adjudicating applications for political asylum. In 1998, he became a supervisory asylum officer in that office. Madsen is an active, licensed attorney in Illinois and an inactive, licensed attorney in Nebraska.

3. The testimony of Stork and Madsen was credible, as was the testimony of the governments other witnesses. Findings within this section are based on the testimony of Stork, Madsen, and the federal immigration statutes and regulations.

4. "Alien" referred to "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3).

5. An alien file or "A-file" was generated by Citizenship and Immigration Services ("CIS"), another division of DHS, when an individual applied for a benefit through CIS, and such a file was generated by ICE when ICE took adverse action against an individual. A-files contained information such as applications, other materials submitted by the alien, notices to appear, and the record of a deportable or "removable" alien.

4

6.      If an alien met certain criteria, the alien could attain asylum status.  Such status provided the alien with substantial benefits, such as: the ability to remain in the United States indefinitely; immediate work authorization; the ability to apply after one year for adjustment of status to permanent resident; the eventual ability to apply for citizenship; and the ability to receive cancellation of removal.

7.      An applicant for asylum was required to file an I-589 form, the application for asylum and withholding of removal, within one year of the applicant's last arrival in the United States.  8 U.S.C. § 1158(a)(2)(B).  If the deadline was not met, the applicant had the burden of proving to the asylum officer, immigration judge, or Board of Immigration Appeals ("BIA") that the applicant was entitled to an exception to the deadline due to "changed circumstances"[3] or "extraordinary circumstances."[4]  8 U.S.C. § 1158(a)(2)(D); 8 CFR § 208.4(a)(2).

---

[3]"Changed circumstances" were those that materially affected the applicant's eligibility for asylum and could include, but were not limited to: changes occurring in the applicant's country of nationality, or changes in U.S. law.  8 C.F.R. § 208.4(a)(4)(A) & (B).  When changed circumstances were alleged, the asylum application was required to be filed within a "reasonable" time given the changed circumstances.  If an applicant could show a lack of awareness of the change of circumstances, the delayed awareness was considered in determining whether the period was "reasonable."   8 C.F.R. § 208.4(a)(4)(C)(ii).

[4]"Extraordinary circumstances" were considered to be "events or factors directly related to the failure to meet" the one-year deadline.  Given extraordinary circumstances, the application was required to be filed within a "reasonable" period.  The applicant was required to prove to the satisfaction of the asylum officer, immigration judge, or BIA, that the applicant did not intentionally create the circumstances through his or her action or inaction; that the circumstances were directly related to the failure to file a timely application; and that the delay was reasonable under the circumstances.   Such circumstances included, but were not limited to: serious illness, mental or physical disability, including effects of persecution or violent harm suffered during the one-year period after arrival; legal disability; ineffective assistance of counsel, under specific circumstances; proof that the application was filed before the deadline, but that the application was rejected as improperly filed, returned for corrections, and re-filed within a reasonable period; and the death or serious illness or incapacity of the applicant's legal representative or a member of the applicant's immediate family.  8 C.F.R. 208.4(a)(5).

8.      Asylum applications ("I-589 forms") were provided only in the English language. The form required answers to questions regarding the applicant's personal history; spouse and children; and reasons for requesting asylum. In Part C, the application posed the following questions:

-      Why are you seeking asylum?  Explain in detail what the basis is for your claim.

-      Have you or any member of your family ever belonged to or associated with any organizations or groups in your home country, such as, but not limited to, a political party, student group, labor union, religious organization, military or paramilitary group, civil patrol, guerrilla organization, ethnic group, human rights group, or the press or media?

-      Have you or any member of your family ever been mistreated or threatened by the authorities of your home country or any other home country or by a group or groups that are controlled by the government, or that the government of the country is unable or unwilling to control?  If YES, was it because of [race, religion, nationality, membership in a particular social group, or political opinion?]

-      Have you or any member of your family ever been accused, charged, arrested, detained, interrogated, convicted and sentenced, or imprisoned in your country or any other country, including the United States?

-      Do you fear being subjected to torture (severe physical or mental pain or suffering, including rape or other sexual abuse) in your home country or any other country if you return?

6

- What do you think would happen to you if you returned to the country from which you claim you would be subjected to persecution?

- Describe in detail your trip to the United States from your home country. After leaving the country from which you are claiming asylum, did you or your spouse or child(ren), who are now in the United States, travel through or reside in any other country before entering the United States?

9.    An applicant for asylum who was not an aggravated felon was eligible to submit a Form I-765, Application for Employment Authorization, 150 days after a completed asylum application was submitted or, where an asylum application had been recommended for approval, once notice of the recommended approval was received.  DHS had thirty days from the date of the filing of the Form I-765 to grant or deny the application, except that no employment authorization would be issued to an asylum applicant prior to the expiration of a 180-day period following the filing of the asylum application.  8 C.F.R. § 208.7(a)(1).  Employment authorization was renewable, in increments determined by the Commissioner, as necessary to allow for a decision on the asylum application and any administrative or judicial review. 8 C.F.R. § 208.7(b).

10.   Asylum applications in the Midwest were sent to a regional service center in Lincoln, Nebraska.  After an application for asylum was checked for completeness and a CIS file was located or a new file was made, the application and file were sent from the regional service center to the CIS office in Chicago; the applicant for asylum was called to the local center for matters such as fingerprints and photographs; and,

7

within weeks of filing the application, an applicant received a notice of the asylum interview.

11.   From 1999 to 2004, applicants for asylum in Nebraska were generally interviewed at the INS office in Omaha, Nebraska.  It took approximately two to three years to schedule an interview in an asylum case filed in Omaha, although an applicant in an expedited case could have a hearing within sixty days. Two officers were sent from Chicago; a full day of interviews was scheduled for them; and they documented the interviews upon their return to the Chicago office.  If an applicant requested expedited processing, the interview would take place in Chicago.  Asylum interviews were liberally rescheduled.  Between 1999 and 2003, if an applicant requested a continuance of the interview, the applicant's name would be returned to the general pool of applicants awaiting interviews. Years might pass before the individual would be called again for an interview.

12.   Asylum officers conducted non-adversarial interviews "to elicit all relevant and useful information bearing on whether the applicant ha[d] a credible fear of persecution." 8 C.F.R. § 208.30(d).  At an interview, the applicant could present evidence and other persons could, in the officer's discretion, offer statements at the end of the interview.  8 C.F.R. § 208.30(d)(4).  The applicant could bring an attorney or representative; however, the attorney's or representative's role was limited  due to the non-adversarial nature of the hearing.  Asylum interviews were not recorded or transcribed; they were summarized in the asylum officer's notes for inclusion in the A-file.

8

13.   The asylum applicant had the burden of proving that he or she was a "refugee."  8
      U.S.C. § 1158(b)(1)(B)(I); 8 C.F.R. § 208.13(a).  The applicant could qualify as a
      refugee if he or she suffered past persecution or had a well-founded fear of future
      persecution.  8 U.S.C. § 1101(a)(42)(A); 8 C.F.R. § 208.13(b).

14.   An applicant could show past persecution by establishing that he or she suffered
      persecution in his or her country of nationality on the basis of his or her *own*: race,
      religion, nationality, membership in a particular social group, or political opinion. 8
      U.S.C. § 1101(a)(42)(A); 8 C.F.R. § 208.13(b)(1).  An applicant could show a well-
      founded fear of future persecution by establishing: a) he or she had a fear of
      persecution in his or her country of nationality on the basis of: race, religion,
      nationality, membership in a particular social group, or political opinion, b) a
      reasonable possibility of such persecution existed if the applicant were to return to
      the country of nationality; and c) the applicant was unable or unwilling to return to,
      or avail himself or herself of the protection of, that country due to fear.  8 U.S.C. §
      1101(a)(42)(A); 8 C.F.R. § 208.13(b)(2)(I).  A well-founded fear of persecution was
      considered by DHS to be a one-in-ten chance of persecution.  (Madsen testimony,
      Tr. 511:4-11).[5]

15.   The term "social group" was considered by DHS to be "amorphous."  (Madsen
      testimony, Tr. 503:8 to 505:5).  The term "persecution" was considered by DHS to
      be "undefined."  (*Id.*, Tr. 503:25).  It was "more than discrimination and less than

---

      [5]  See *Makatengkeng v. Gonzales*, 495 F.3d 876, 881-87 (8th Cir. 2007), for a
      discussion of the burden of proof for asylum applicants alleging fear of persecution,
      including economic persecution.

9

death." (*Id.*, Tr. 504:3-4).  Persecution on the basis of sex was not grounds for asylum, no matter how severe or oppressive the persecution; however, asylum could be granted to applicants on the basis of male-to-female transgender status, or sexual orientation.  (*Id.*, Tr. 49:5-12; 508:25 to 509:6).  DHS recognized that persecution could take effect "through economics." (*Id.*, Tr. 504:23 to 505:1).  For example, applicants who were in jeopardy of being assessed an economic penalty for refusing to engage in family planning were eligible for asylum.  (*Id.*).  DHS considered each application on an individual basis.[6]

16.     In considering a discretionary denial of asylum under 8 C.F.R. §§ 208.13(b)(1) or (b)(2), the asylum officer and immigration judge were to:

> consider, but [were] not limited to considering, whether the applicant would face other serious harm in the place of the suggested relocation; any ongoing civil strife within the country; administrative, economic, or judicial infrastructure; geographical limitations; and social and cultural constraints, such as age, gender, health, and social and familial ties.  Those factors may, or may not be, relevant, depending on all the circumstances of the case, and are not necessarily determinative of whether it would be reasonable for the applicant to relocate.

8 U.S.C. § 208.13(b)(3).

The fate of a spouse or child of an alien could be considered under certain circumstances in the determination of an applicant's credible fear of persecution.

8 C.F.R. § 208.30(b).

---

[6] "You have to be careful how you craft these particular social groups. . . ." (Madsen testimony, Tr. 508:3-4).  "[I]mmigration law is incredibly complex. . . . it's complicated." (*Id.*, Tr. 524:4-8).  "Immigration works very much on the individual basis." (*Id.*, Tr. 522:3).

17.   In deciding whether an applicant had a credible fear of persecution, the officer was required to "consider whether the alien's case present[ed] novel or unique issues that merit[ed] consideration in a full hearing before an immigration judge." 8 C.F.R. § 208.30(e)(4).  If an officer decided the issue of credible fear in the applicant's favor, the alien was required to appear for full consideration of the asylum and withholding-of-removal claims before an immigration judge.  If the issue of credible fear was decided adverse to the applicant, the alien could have the matter reviewed by an immigration judge.  8 C.F.R. § 208.30(f) & (g).  Decisions by an immigration judge adverse to an applicant were subject to review by the BIA, and then by a U.S. Court of Appeals.

18.   Citizens of any country, including Mexico, could obtain asylum in the United States. All applications were reviewed on a case-by-case basis.  In each year from 1999 through 2005, no fewer than 37 and as many as 64 Mexicans were granted asylum in the United States.  During each of those years, thousands of asylum applications were submitted by Mexicans.  The vast majority of those claims were withdrawn before resolution.

19.   If the Attorney General determined that an alien knowingly filed a frivolous application for asylum and the alien received notice of the consequences of filing a frivolous application, the alien could be permanently ineligible for any benefits under U.S. immigration law, as of the date of the final decision on the application.  8 U.S.C. § 1158(d)(6).  The permanent ineligibility was referred to as a permanent "bar," and was adopted as a "hammer" or penalty to discourage the manipulation of the immigration system through the filing of frivolous asylum applications.

11

20.   An application was considered to be frivolous if "any of its material elements [was] deliberately fabricated," and this finding could only be made if the immigration judge or the BIA was satisfied that the applicant had sufficient opportunity to account for any discrepancies or implausible aspects of the claim.   A finding that an alien filed a frivolous application for asylum did not preclude the alien from seeking withholding of removal.  8 C.F.R. § 208.20.

21.   The Attorney General could cancel an alien's removal and adjust the alien's status to that of permanent resident if the alien had 1) been physically present continuously for at least ten years, 2) been of good moral character during that period, 3) had not been convicted of certain offenses, and 4) established that removal would result in exceptional and extremely unusual hardship to the alien's U.S.-citizen or permanent-resident spouse or child.  8 U.S.C. § 1229b(b)(1).  The opportunity for an alien to receive such a cancellation of removal and adjustment of status could be lost if it was determined that the alien submitted a frivolous application for asylum.  8 U.S.C. § 1158(d)(6).

### *Villarreal's Immigration Clients*

22.   The testimony of Villarreal's immigration clients was credible.  In deciding what weight to give to their testimony, I recognize that they each exhibited some apprehension that they had done something illegal or inappropriate by submitting asylum applications; they each had a desire to remain in the United States and to avoid adverse consequences to themselves and their families; and they each had a strong motive to deny any intentional wrongdoing and to please the government.

### *Jose Rosario Robles-Rangel*

23.  Robles-Rangel was the subject of Count II of the Superseding Indictment, and at all relevant times was a citizen of Mexico.

24.  Robles-Rangel and his wife, Cynthia Robles ("Cynthia"), went to Villarreal's office in the summer of 2002.  Robles-Rangel was seeking a work permit, and understood that Villarreal would help him obtain a work permit.  Cynthia spoke with Villarreal in English, translating for Robles-Randel, who spoke Spanish.  Cynthia filled out certain paperwork for Robles-Rangel in Villarreal's office.  Cynthia wanted her husband to obtain a work permit, as she was the only one in the family working.  Robles-Rangel signed two papers – one was to name Villarreal as his representative, and the other was a form that had not been filled in and that he understood to be an application for a work permit.  Cynthia had the same understanding of the documents.  Robles-Rangel and Cynthia paid Villarreal between $850 and $1,000 for his services, and $75 per month thereafter, for approximately ten months.  Robles-Rangel ultimately received a work permit.

25.  Robles-Rangel's A-file was received into evidence.

26.  Robles-Rangel's I-589 application was submitted on June 24, 2002.

27.  At the time of Robles-Rangel's application, his wife Cynthia was a permanent U.S. resident.  She became a naturalized U.S. citizen prior to the time of trial.

28.  Robles-Rangel's wife could have completed an I-130 petition at the time he applied for asylum, requesting permanent-residence status for Robles-Rangel, based on her own status, although it is not known whether this application would have been successful.

29.     Robles-Rangel stated in his I-589 application that he entered the United States on February 1, 1983, without inspection.

30.     In answer to the question in the I-589 form, "Why are you seeking asylum," Robles-Rangel answered: "I want to get a better life.  I am afraid of going back to Mexico, due to crime and economic situation."

31.     In answer to the questions asking whether Robles-Rangel or any member of his family had ever been 1) a member of certain groups, 2) mistreated or threatened by government authorities or groups of any country, or 3) accused, charged, arrested, detained, interrogated, convicted and sentenced, or imprisoned in any country, Robles-Rangel answered "No."

32.     In answer to the question in the I-589 form asking whether Robles-Rangel feared being subjected to torture in his home country or any country if he were to return to his home country, Robles-Rangel answered "No."

33.     In answer to the question in the I-589 form "What do you think would happen to you if you returned to the country from which you claim you would be subjected to persecution," Robles-Rangel answered: "I will not find a good job, and I will not be able to support my children."

34.     Robles-Rangel stated in his I-589 application that he filed his asylum application more than one year after his last arrival in the United States because he "was unaware of the asylum process."

35.     Prior to the time of trial, Robles-Rangel secured legal representation of attorney Amy L. Peck.

36.     Robles-Rangel did not have an asylum interview.

14

37.   Robels-Rangel's application was withdrawn.

38.   At the time of trial, Robles-Rangel's removal proceedings were pending.

39.   Robles-Rangel applied for cancellation of removal.

### *Nora Soto*

40.   Soto was the subject of Count III of the Superseding Indictment, and at all relevant times was a citizen of Mexico.

41.   In 2001, Soto sought Villarreal's services to help her get a work permit that would allow her to be in the United States legally.  She spoke Spanish, and Villarreal spoke English, so they communicated through a secretary.  Soto paid Villarreal $880 and $50 per month thereafter, plus reimbursement for expenses.  Soto estimates that she and her husband paid Villarreal approximately $2,000 in total.  Soto signed papers provided to her that were not completely filled out, and which she understood to be an application for a work permit.  Villarreal told Soto that she would be applying for a work permit through the asylum process, and then the asylum application would be withdrawn and an application for legal permanent residence submitted.  Villarreal told Soto that this strategy might not work and she could be placed in removal proceedings.  Soto did obtain a work permit.

42.   Soto's A-file was received into evidence.

43.   Soto's I-589 application was first submitted on June 20, 2002.  The application was returned for correction of an error, and it was re-filed on July 10, 2002.

44.   Soto stated in her I-589 application that she last entered the United States in February 1999, without inspection.

15

45.    In answer to the question in the I-589 form "Why are you seeking asylum," Soto
       answered: "I am seeking asylum due to the better life here in the United States."

46.    In answer to one of the questions asking whether Soto or any member of her family
       had ever been 1) a member of certain groups, 2) mistreated or threatened by
       government authorities or groups of any country, or 3) accused, charged, arrested,
       detained, interrogated, convicted and sentenced, or imprisoned in any country, Soto
       answered "yes." Her answer indicated that a member of her family was mistreated
       or threatened for being a member of a particular social group by one or more groups
       controlled by a foreign government or that the government was unable or unwilling
       to control.  Soto did not provide additional information as requested.

47.    In answer to the question in the I-589 form asking whether Soto feared being
       subjected to torture in her home country or any country if she were to return to her
       home country, she answered "No."

48.    In answer to the question in the I-589 form "What do you think would happen to you
       if you returned to the country from which you claim you would be subjected to
       persecution," Soto answered: "I would not be able to survive due to the crime &
       economic situation."

49.    Soto stated in her I-589 application that she filed her asylum application more than
       one year after her last arrival in the United States because she "was unaware of the
       asylum process."

50.    Soto had an asylum interview on April 7, 2005.  By the time of the interview,
       Villarreal was no longer representing Soto.  Her new attorney did not attend the
       hearing.  Soto admitted to the hearing officer that she had entered the United States

illegally five or six times.  The hearing officer's notes show that Soto-Gonzalez stated that she left Mexico "for a better life for [her] kids & us b/c in Mexico not enough jobs – a better life – too many delinquents, unemployed."  The notes reflect that Soto-Gonzalez stated her concerns about returning to Mexico were that she would have to start over with no property, home or job and that her children had lived their entire lives in the United States.  She explained that her nephew sexually abused one of her children and that her brother (the nephew's father) who went back to Mexico said that he would kill her.

51.   On May 9, 2005, Soto's application was referred to the immigration judge as one that should be denied for failure to apply within the one-year time period.

52.   At the time of trial, Soto's application was still pending.

53.   Soto received authorization to work in the United States.

54.   If Soto establishes continuous physical presence in the United States for ten years, good moral character during that time, and extreme hardship to her U.S.-citizen child, she could be eligible for cancellation of removal.

### *Manuel Acosta*

55.   Acosta was the subject of Count IV of the Superseding Indictment, and at all relevant times was a citizen of Mexico.

56.   In 2002, Acosta and his wife went to Villarreal to seek assistance in obtaining work permits.  Acosta and his wife spoke very little English, and Villarreal did not speak Spanish.  They communicated through a translator in Villarreal's office.  Acosta and his wife paid Villarreal $1500 and $100 per month thereafter for his services to them, and $750 and $75 per month thereafter for assistance for their daughter, Paola

17

Michaelis.  Acosta signed papers provided by Villarreal, which Acosta thought could resolve his legal status in the United States.

57.   Acosta's A-file was received into evidence.

58.   Acosta's I-589 application was filed on April 25, 2002.

59.   Acosta stated in his I-589 application that he last entered the United States on January 29, 1993, with a passport to visit his sister.

60.   During all times relevant to this litigation, Acosta had no wife or child who was a United States citizen.

61.   In answer to the question in the I-589 form "Why are you seeking asylum," Acosta answered: "I am seeking asylum for a better life."

62.   In answer to one of the questions asking whether Acosta or any member of his family had ever been 1) a member of certain groups, 2) mistreated or threatened by government authorities or groups of any country, or 3) accused, charged, arrested, detained, interrogated, convicted and sentenced, or imprisoned in any country, Acosta answered "yes." His answer indicated that a member of his family was mistreated or threatened for being a member of a particular social group by one or more groups controlled by a foreign government or that the government was unable or unwilling to control.  Acosta did not provide additional information as requested.


63.   In answer to the question in the I-589 form asking whether Acosta feared being subjected to torture in his home country or any country if he were to return to his home country, he answered "No."

18

64.    In answer to the question in the I-589 form "What do you think would happen to you if you returned to the country from which you claim you would be subjected to persecution," Acosta answered: "I would not be able to survive due to the economic deprivation and due to all the crime and gangs in Mexico."

65.    Acosta stated in his I-589 application that he filed his asylum application more than one year after his last arrival in the United States because he "was unaware of the asylum process."

66.    Acosta was granted an asylum interview.  The asylum officer stated that Acosta:

> credibly testified that he was never harmed in Mexico; rather, he left Mexico and traveled to the United States in 1993 to seek better economic opportunities.  He fears that he may be harmed in Mexico due to the general state of violence that is being perpetrated in Mexico by criminals and by guerrillas.  The applicant stated that the police lack the means and desire to quell the violence.  Additionally, the applicant stated that he would suffer other serious harm in Mexico upon his return: he fears he would suffer from poverty as a result of the lack of economical and educational opportunities; and, he fears that the government of Mexico is so corrupt that they may steal any valuables that he manages to acquire.  However, the applicant stated that he does not face a specific threat of harm from anyone in Mexico.

67.    On July 13, 2004, Acosta's application was referred to the immigration judge as one that should be denied for failure to apply within the one-year time period.

68.    At the time of trial, Acosta's application was still pending.  Although Acosta has not applied for cancellation of removal, if he were to do so and receive such relief he would be a permanent resident.  Absent cancellation of removal or any other benefit, Acosta will be deported or offered the opportunity of voluntary departure.

### *Norma Elena Hernandez*

69.   Hernandez was the subject of Count V of the Superseding Indictment, and at all relevant times was a citizen of Mexico.

70.   In the summer of 2002, Hernandez went to Villarreal's office.  Hernandez was not working, did not have a work permit, was not in the United States legally, and wanted Villarreal's help to attain legal status.  She did not speak English.  She communicated with Villarreal through an interpreter.  Hernandez signed papers that Villarreal provided to her, but does not know if they were blank or filled out when she signed them.  Hernandez paid Villarreal $850 and $75 monthly thereafter, for a total of approximately $1400 to $1500.  At the time of trial, Hernandez had a work permit that she had maintained since 2002.

71.   Hernandez's A-file was received into evidence.

72.   Hernandez's I-589 application was filed on August 5, 2002.

73.   Hernandez last entered the United States in September 1992 as a visitor.

74.   At the time of her application, Hernandez had a child who was a United States citizen.

75.   In answer to the question in the I-589 form "Why are you seeking asylum," Hernandez answered: "I am seeking asylum due to the economic condition in Mexico now.  There are not enough jobs available."

76.   In answer to one of the questions asking whether Hernandez or any member of her family had ever been 1) a member of certain groups, 2) mistreated or threatened by government authorities or groups of any country, or 3) accused, charged, arrested,

detained, interrogated, convicted and sentenced, or imprisoned in any country, she answered "no" and "N/A."

77.    In answer to the question in the I-589 form asking whether Hernandez feared being subjected to torture in her home country or any country if she were to return to her home country, she answered "No."

78.    In answer to the question in the I-589 form "What do you think would happen to you if you returned to the country from which you claim you would be subjected to persecution," Hernandez answered: "N/A."

79.    Hernandez stated in her I-589 application that she filed her asylum application more than one year after her last arrival in the United States because she "recently learned about the asylum process."

80.    Hernandez had an asylum interview on October 7, 2002.  The asylum officer's handwritten notes and typed summary state that Hernandez feared "harm" upon returning to Mexico based on Mexico's economic conditions and claimed no past or future persecution.

81.    Hernandez waived the appearance of counsel at her asylum interview.

82.    Hernandez's application was referred to the immigration judge as one that should be denied for failure to apply within the one-year time period.

83.    At the time of trial, Hernandez's application was still pending.

84.    Hernandez also applied for cancellation of removal, and at the time of trial, that matter was also pending before an immigration judge.

### *HeribertoTenorio Castro*

85.    Castro was a client of Villarreal who at all relevant times was a citizen of Mexico. The evidence regarding Castro, including his A-file, was admitted under Federal Rule of Evidence 404(b) as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

86.    In the summer of 2003, Castro and his wife paid Villarreal $850, and then $75 per month thereafter, for a total of $1,200, to get Castro a work permit so he could work in the Untied States legally. Castro did not speak English; his wife spoke very little English; and they communicated with Villarreal through translators. Villareal filed an I-589 asylum application on Castro's behalf, and also an I-130 form, on July 28, 2003, seeking to adjust his status to that of permanent resident. When Castro signed the asylum application, he did not understand that he was signing an asylum application.

87.    Castro stated in his asylum application that he last entered the United States on December 2, 1989, as a tourist.

88.    At Castro's asylum interview, he stated that he last entered the U.S. in 1998.

89.    In answer to the question in the I-589 form "Why are you seeking asylum," Castro answered: "I am afraid of going back to Mexico due to the crime and bad economic situation down there. And I do not want to rise [sic] child on those condition."

90.    In answer to one of the questions asking whether Castro or any member of his family had ever been 1) a member of certain groups, 2) mistreated or threatened by government authorities or groups of any country, or 3) accused, charged, arrested,

detained, interrogated, convicted and sentenced, or imprisoned in any country, Castro answered "no."

91.   In answer to the question in the I-589 form asking whether Castro feared being subjected to torture in his home country or any country if he were to return to his home country, Castro answered "No."

92.   In answer to the question in the I-589 form "What do you think would happen to you if you returned to the country from which you claim you would be subjected to persecution," Castro answered: "I will not be able to support my family either myself because of lack of job opportunities."

93.   Castro stated in his I-589 application that he filed his asylum application more than one year after his last arrival in the United States because he "did not know about asylum process."

94.   Castro stated in his I-589 application that he was married and that his wife was a permanent resident.

95.   Castro stated in his I-589 form that he had a child who was a United States citizen.

96.   On July 28, 2003, Castro's wife filed an I-130 form on his behalf.

97.   Castro appeared at his asylum interview on November 2, 2004.  At the interview, Castro withdrew his asylum application because "of misrepresentation by attorney Villarreal."

98.   As of the trial date, the status of Castro's asylum application was "withdrawn."

99.   By March of 2006, Joseph Lopez Wilson began representing Castro.

100.   Castro's wife was naturalized on May 19, 2006.

101.   Castro filed an I-485 form, Application to Register Permanent Residence or Adjust Status, based on his wife's status as a United States citizen, which was approved on February 8, 2007.

102.   Castro's immigration status at the time of trial was that of a permanent resident.

### *Guadalupe Gonzalez-Aispuro*

103.   Guadalupe Gonzalez-Aispuro was a client of Villarreal who at all relevant times was a citizen of Mexico.  The evidence regarding Gonzalez-Aispuro, including her A-file, was admitted under Federal Rule fo Evidence 404(b) as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

104.   In 2000, Gonzalez-Aispuro went to Villarreal for help in obtaining a humanitarian visa.  She and her husband had three U.S.-citizen children, one of whom had been diagnosed with lead poisoning.  Neither Gonzalez-Aispuro nor her husband could speak, read or write in English.  They signed forms provided to them by Villarreal, and believed they were signing applications for humanitarian visas.  Gonzalez-Aispuro paid Villareal $3,000, and $175 per month thereafter, for an undetermined amount of time.

105.   Gonzalez-Aispuro stated in her application that she last entered the United States on April 20, 1990, without inspection.

106.   In answer to the question in the I-589 form "Why are you seeking asylum," Gonzalez-Aispuro answered: "I am seeking a better life due to the fact that the economy in my country."

107.   In answer to one of the questions asking whether Gonzalez-Aispuro or any member of her family had ever been 1) a member of certain groups, 2) mistreated or threatened by government authorities or groups of any country, or 3) accused, charged, arrested, detained, interrogated, convicted and sentenced, or imprisoned in any country, she answered "no."

108.   In answer to the question in the I-589 form asking whether Gonzalez-Aispuro feared being subjected to torture in her home country or any country if she were to return to her home country, she answered "No."

109.   In answer to the question in the I-589 form "What do you think would happen to you if you returned to the country from which you claim you would be subjected to persecution," Gonzalez-Aispuro answered: "N/A."

110.   Gonzalez-Aispuro stated in her I-589 application that she filed her asylum application more than one year after her last arrival in the United States because "I was not aware of asylum."

111.   An asylum interview was scheduled for Gonzalez-Aispuro, to take place on September 11, 2003.  However, on September 9, 2003, attorney Vard Johnson sent Gonzalez-Aispuro's signed withdrawal of her asylum application to the CIS.

112.   Gonzalez-Aispuro received a work permit before the time of trial.

### *Paola Michaelis*

113.   Paola Michaelis was a client of Villarreal and at all relevant times was a citizen of Mexico.  The evidence regarding Michaelis, including her A-file, was admitted under Federal Rule of Evidence 404(b) as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

25

114. Michaelis was Acosta's daughter.  In 2002, she went to see Villarreal with her parents.  She was 18 years old; an illegal alien married to a U.S. citizen; and could speak, read and write English as well as Spanish.  Michaelis informed Villareal that she was married to a U.S. citizen and she wanted to legalize her status in the Untied States.  Michaelis signed papers provided by Villarreal, but did not read them.  Michaelis paid Villarreal $775 in cash, and continuing payments, totaling over $1,000.

115. Michaelis stated in her application that she last entered the United States on January 29, 1993, without inspection.

116. Michaelis's application reflected that she was married to a United States citizen and therefore may have been entitled, at the time she filed her asylum application, to an adjustment of status to that of permanent resident.

117. In answer to the question in the I-589 form "Why are you seeking asylum," Michaelis answered: "I am seeking asylum to get a better life."

118. In answer to one of the questions asking whether Michaelis or any member of her family had ever been 1) a member of certain groups, 2) mistreated or threatened by government authorities or groups of any country, or 3) accused, charged, arrested, detained, interrogated, convicted and sentenced, or imprisoned in any country, Michaelis answered "no."

119. In answer to the question in the I-589 form asking whether Michaelis feared being subjected to torture in her home country or any country if she were to return to her home country, she answered "No."

120.   In answer to the question in the I-589 form "What do you think would happen to you if you returned to the country from which you claim you would be subjected to persecution," Michaelis answered: "I will not be able to get a well pay [sic] job to pport [sic] my family and myself."

121.   Michaelis stated in her I-589 application that she filed her asylum application more than one year after her last arrival in the United States because "I was not aware about asylum process." .

122.   An asylum interview was held for Michaelis on August 22, 2003.  The asylum officer's notes from the interview state that Michaelis "left for economical reasons victims of corrupt government" and did not "fear physical harm."

123.   Michaelis's case was referred to the immigration judge as untimely filed.

124.   In Michaelis's case, removal proceedings were begun.

125.   In July 2006, Michaelis's status was adjusted to that of permanent resident.

126.   Michaelis was issued a work permit before the time of trial.

### *Villarreal's Conduct and Intent*

127.   The testimony of Villarreal's former employees was credible, as was the testimony of the Defendant's other witnesses.

128.   Sabrina Escamilla was an assistant working in Villarreal's office as an interpreter and receptionist in 2002.  Escamilla completed I-589 forms for Villarreal's clients by copying answers from a sample form.  After she completed the I-589 forms, and Villarreal reviewed them, she placed them in the mail to INS or CIS as part of her job duties. She completed more than fifty asylum forms, and estimated that eighty percent of the office's work was asylum-related.

129.   Kevin Lunt was an assistant working in Villarreal's office as an interpreter and researcher in 2002.  Villareal asked Lunt to research ecomonic and crime statistics concerning Mexico, and human rights abuses and discrimination, to support a theory that citizens of Mexico may be eligible for asylum.  Lunt conducted the research and prepared a report for Villarreal.

130.   Carla Pina worked for Villarreal from approximately 2000 to 2002, as an interpreter and office assistant.  When Pina worked for Villarreal, fifty to sixty percent of his clients were Mexican nationals.  Pina interview approximately 100 clients during her tenure with Villarreal.  Pina helped to complete asylum applications in Villarreal's office, by using a sample form and copying answers from the sample.

131.   Villarreal's employees helped him to communicate with his clients who spoke Spanish, because Villarreal spoke very little Spanish.  When clients came to Villarreal's office, an employee would help the client complete a questionnaire, soliciting the client's personal history and immigration status.   Generally, after a questionnaire was complete, Villarreal would meet with the client.  If Villarreal directed that an asylum application be prepared, an employee would obtain the client's signature on the blank application and fill in the application later, to save the client the time and expense of a return visit.  The applications were completed through use of information from the questionnaires, and from a sample asylum application provided by Villarreal.

132.   The applications were sent to INS or CIS through use of the United States mail.  Villarreal also used the United States mail to send bills to his clients and to received funds from them.

133.   Villarreal's employees did not conceal from the clients the fact that asylum applications were being submitted on their behalf.  Villarreal's assistants believed that the clients understood that asylum applications were being submitted on their behalf, and that the clients simply wanted to get work permits.  Villarreal's employees thought Villarreal was doing what he believed was best for his clients by using a novel theory of asylum eligibility.

134.   Villarreal was aware that submission of frivolous asylum applications could result in serious adverse consequences for the applicants, including the denial of certain immigration benefits and opportunities.

135.   From 1999 to 2004, Villarreal submitted approximately 315 asylum applications on behalf of Mexican nationals.

136.   Only one asylum application submitted by Villarreal was found by an immigration judge to be frivolous, and that decision was reversed by the BIA.

137.   No client of Villarreal suffered any permanent bar as a result of the submission of an asylum application.

138.   The asylum applications that Villarreal completed for the signatures of Robles-Rangel, Soto-Gonzales, Acosta-Cazares, and Herdandez for submission to CIS were not legally frivolous, because their material elements were not deliberately fabricated.

139.   Villarreal knew that the asylum applications completed for the signatures of Robles-Rangel, Soto-Gonzales, Acosta-Cazares, and Hernandez for submission to CIS were highly likely to be denied.

140.   Villarreal also knew that the submission of asylum applications, although highly likely
       to be denied, could result in certain benefits for the applicants, including the
       expedited issuance of work permits, and could result in the applicants being allowed
       to remain in the United States for several years pending the review and disposition
       of the applications.

141.   Villarreal acted recklessly in failing to communicate with his clients and in failing to
       ensure that he was acting in his clients' best interests.  With respect to his clients
       who wanted to remain in the United States permanently, or for many years,
       Villarreal's actions were contrary to the clients' interests and could have had serious
       adverse consequences for the clients.  Villareal was indifferent to his clients'
       interests.

## ELEMENTS

The elements of the offenses charged in the Superseding Indictment, summarized through reference to Eighth Circuit Model Jury Instructions,[7] are as follows:

### Count II - Mail Fraud/Aiding and Abetting

The crime of mail fraud, as charged in Count II of the Superseding Indictment, has three elements, which are:

**One:**      Beginning on or about November 1, 2001, and continuing to on or
              about December 1, 2004, Villarreal, voluntarily and intentionally
              devised or made up a scheme to 1) defraud various immigration

---

[7]See Eighth Circuit Model Jury Instructions (Crim.) 6.18.1341, 6.18.1957.

clients of money, or 2) obtain money by means of material false representations or promises;

**Two:**      Villarreal, did so with the intent to defraud; and

**Three:**    Villarreal, used, or caused to be used, the mail, a private interstate carrier, or a commercial interstate carrier, in furtherance of, or in an attempt to carry out, an essential step in the scheme by mailing on June 24, 2002, a Form I-589 (Asylum Application), to Jose Rosario Robles-Rangel.

The phrase "scheme to defraud" includes any plan or course of action intended to deceive or cheat another out of money by employing material falsehoods, concealing material facts, or omitting material facts.  It also means the obtaining of money from another by means of material false representations or promises.  A scheme to defraud need not be fraudulent on its face but must include some sort of fraudulent misrepresentation or promise reasonably calculated to deceive a reasonable person.

A statement or representation is "false" when it is untrue when made or effectively conceals or omits a material fact.

A representation or promise is "material" if it has a natural tendency to influence, or is capable of influencing, the decision of a reasonable person in deciding whether to engage or not to engage in a particular transaction.  However, whether a representation or promise is "material" does not depend on whether the person was actually deceived.

To act with "intent to defraud" means to act knowingly and with the intent to deceive someone for the purpose of causing some financial loss or loss of property or property

31

rights to another or bringing about some financial gain to oneself or another to the detriment of a third party. With respect to false statements, a defendant must have known the statement was untrue when made or have made the statement with reckless indifference to its truth or falsity.

It is not necessary that the use of the mail or an interstate carrier by the defendant be contemplated or that he do any actual mailing or sending of material by an interstate carrier or specifically intend that the mail or an interstate carrier be used. It is sufficient if the mail or an interstate carrier was in fact used to carry out the scheme and the use of the mail or an interstate carrier by someone was reasonably foreseeable.

Mailings or deliveries by an interstate carrier which are designed to lull victims into a false sense of security, postpone inquiries or complaints, or make the transaction less suspect are mailings or deliveries in furtherance of the scheme.

Each separate use of the mail or an interstate carrier in furtherance of a scheme to defraud constitutes a separate offense.

A person may also be found guilty of mail fraud even if he personally did not do every act constituting the offense charged, if he aided and abetted the commission of mail fraud.

In order to have aided and abetted the commission of a crime a person must, before or at the time the crime was committed:

    (1) have known mail fraud was being committed or going to be committed;

    (2) have knowingly acted in some way for the purpose of causing, encouraging, or aiding the commission of mail fraud; and

    (3) have intended to defraud.

32

To prove Villarreal, guilty of mail fraud by reason of aiding and abetting, the government must show beyond a reasonable doubt that all of the elements of mail fraud were committed by some person or persons and that Villarreal aided and abetted the commission of that crime.

Merely being present at the scene of an event, or merely acting in the same way as others or merely associating with others, does not prove that a person has become an aider and abettor.  A person who has no knowledge that a crime is being committed or about to be committed, but who happens to act in a way which advances some offense, does not thereby become an aider and abettor.

### Count III - Mail Fraud/Aiding and Abetting

All of the elements under "Count II" apply to Count III, including those related to aiding and abetting, except that, for Count III, the third element of the principal offense of mail fraud is as follows:

**Three:**     Villarreal used, or caused to be used, the mail, a private interstate carrier, or a commercial interstate carrier, in furtherance of, or in an attempt to carry out, the essential step in the scheme of mailing on July 12, 2002, a Form I-589 (Asylum Application), to Nora Soto.

### Count IV - Mail Fraud/Aiding and Abetting

All of the elements and instructions under "Count II" apply to Count IV, including those related to aiding and abetting, except that for Count IV, the third element of the principal offense of mail fraud is as follows:

**Three:**       Villarreal used, or caused to be used, the mail, a private interstate carrier, or a commercial interstate carrier, in furtherance of, or in an attempt to carry out, the essential step in the scheme of mailing on April 18, 2002, a Form I-589 (Asylum Application), to Manuel Acosta.

## Count V - Mail Fraud/Aiding and Abetting

All of the elements and instructions under "Count II" apply to Count V, including those related to aiding and abetting, except that for Count V, the third element of the principal offense of mail fraud is as follows:

**Three:**       Villarreal used, or caused to be used, the mail, a private interstate carrier, or a commercial interstate carrier, in furtherance of, or in an attempt to carry out, the essential step in the scheme of mailing on August 1, 2002, a Form I-589 (Asylum Application), to Norma Elena Hernandez.

## Count VI - Money Laundering/Aiding and Abetting

The crime of engaging in a monetary transaction in property derived from mail fraud as charged in Count VI of the Superseding Indictment, has five elements, which are:

**One:**         On or about August 15, 2002, Villarreal knowingly withdrew funds from bank account number 56022871 at Commercial Federal Bank (now Bank of the West) in Omaha, Nebraska, in the amount of approximately $42,654.67;

**Two:**　　　　The withdrawal was of money of a value greater than $10,000 derived from mail fraud as charged in Counts II through V of the Superseding Indictment;

**Three:**　　　Villareal then knew that the withdrawal involved proceeds of a criminal offense;

**Four:**　　　The withdrawal took place in the District of Nebraska; and

**Five:**　　　The withdrawal in some way or degree affected interstate commerce.

Villareal may also be found guilty of mail fraud even if he personally did not do every act constituting the offense charged, if he aided and abetted the commission of money laundering.

In order to have aided and abetted the commission of the crime, Villarreal must, before or at the time the crime was committed:

　　(1)　have known money laundering was being committed or going to be committed;

　　(2)　have knowingly acted in some way for the purpose of causing, encouraging, or aiding the commission of money laundering; and

　　(3)　have intended to defraud.

To prove Villarreal guilty of money laundering by reason of aiding and abetting, the government must show beyond a reasonable doubt that all of the elements of money laundering were committed by some person or persons and that Villareal aided and abetted the commission of that crime.

35

**BURDEN OF PROOF**

The government bears the burden of proving, beyond a reasonable doubt, each essential element of the crimes charged.

**CONCLUSIONS OF LAW**

1.   Unlike the defendant in *United States v. Walker,* 191 F.3d 326 (2nd Cir. 1999), Villarreal did not deliberately fabricate histories of persecution, comprising material elements of his clients' asylum applications.  Instead, he presented a meritless, basis for each asylum application, *i.e.*, adverse economic conditions and high crime in Mexico.

2.   Although the government demonstrated that Villarreal devised a scheme to manipulate and misuse the U.S. immigration process, *i.e.*, the submission of meritless asylum applications from Mexican nationals to facilitate the expedited issuance of work permits and to forestall removal proceedings, the government has not proved, beyond a reasonable doubt, that Villarreal intended to defraud his immigration clients, Jose Robles-Rangel, Nora Soto, Manuel Acosta, or Norma Elena Hernandez, through the use of that scheme.

3.   Because the government has not met its burden of proof with respect to Counts II, III, IV or V of the Superseding Indictment, related to mail fraud, it cannot meet its burden of proof with respect to Count VI, *i.e.*, engaging in a monetary transaction in property derived from mail fraud.[8]

---

[8]For this reason, the testimony and other evidence regarding Villarreal's financial transactions is not discussed in the findings of fact.

36

IT IS ORDERED:

1.      The Defendant, Rufino Villarreal, is not guilty of the charges set forth in

        Counts II, III, IV, V and VI of the Superseding Indictment; and

2.      The Indictment and Superseding Indictment are dismissed.


DATED this 30th day of December, 2008.


                                        BY THE COURT:


                                        s/Laurie Smith Camp
                                        United States District Judge